

U.S. Department of Justice

United States Attorney
Eastern District of New York

LKG/KDE

271 Cadman Plaza East
Brooklyn, New York 11201

July 10, 2018

By ECF, E-mail and Hand

The Honorable Dora L. Irizarry
Chief United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Robert Pisani
     Criminal Docket No. 17-155 (S-2) (DLI)

Dear Chief Judge Irizarry:

  The government respectfully submits this letter in advance of the defendant Robert Pisani's sentencing, which is scheduled for July 24, 2018, at 11:00 a.m. Given the evidence of the defendant's obstruction of justice outlined below, as well as his recent conviction for a crime he committed while on pretrial release that increases his criminal history score, the government respectfully recommends that the Court impose a sentence of 30 months' imprisonment.

I. Background

  On November 17, 2017, the defendant pleaded guilty to the sole count of the second superseding information (the "Information"), charging conspiracy to collect an unlawful debt, in violation of 18 U.S.C. §§ 1962(d) and 1963. See Pre-Sentence Investigation Report ("PSR") ¶ 1. The defendant was charged in the Information (and the underlying indictments) based on his association with the Bonanno crime family of La Cosa Nostra (the "Bonanno crime family"), and his criminal conduct on its behalf. See id. ¶¶ 1, 12. More specifically, the defendant was an associate on record with inducted soldier and, later, acting captain Ronald Giallanzo. See id. ¶ 12. Through his guilty plea, the defendant admitted to conspiring to conduct and participate in the affairs of the Bonanno crime family through the collection of an unlawful debt that was incurred through illegal gambling activity.

  As outlined in its initial sentencing letter dated June 6, 2018, the government requested that, in light of the Section 3553(a) factors, the Court impose a sentence of 21

months' imprisonment, at the top of the then-applicable Guidelines range.  (See June 6, 2018 Gov. Sent. Ltr., ECF Dkt. No. 287.)

Thereafter, two new facts came to light that affect the Guidelines calculation and the Court's balancing of the Section 3553(a) factors.  First, on June 27, 2018, a jury sitting in Queens County Criminal Court found the defendant guilty of Forcible Touching, in violation of New York Penal Law ("NYPL") § 130.52(1) (a Class A misdemeanor), and Harassment in the Second Degree, in violation of NYPL § 240.26(1) (a violation), relating to the defendant's sexual assault of a female employee (the "Victim") on April 28, 2017, at the All American Bagel and Barista, one of the defendant's businesses (the "State Case").[1]  (See May 8, 2017 Gov. Mot. to Revoke Bond, ECF Dkt. No. 101.)  As established at trial, while on pretrial release on the instant case (the "Federal Case"), the defendant grabbed the Victim's buttocks, snapped her bra strap open, tried to reach under her shirt and placed the Victim's hand on his penis, all without her consent.  Sentencing on the State Case is currently scheduled for August 14, 2018.

Second, the government uncovered additional evidence that reveals the defendant's participation in a conspiracy and attempt to obstruct the bail revocation hearing that was scheduled for May 16, 2017, as a result of the defendant's arrest on the State Case (the "Bail Revocation Hearing").  Between approximately May 12, 2017 and May 16, 2017, the defendant was part of a conspiracy and attempt to tamper with the Victim.  Specifically, with the intent to obstruct the prosecution and sentencing in the Federal Case, the defendant knowingly participated in a plan in which one of his associates, Patricia Adams, approached the Victim's father and, with corrupt intent, harassed him in an attempt to dissuade the Victim from cooperating with law enforcement, including by testifying at the Bail Revocation Hearing.[2]

Accordingly, the government respectfully submits this letter (1) to detail the evidence that proves the defendant's participation in such misconduct by a preponderance of the evidence, which warrants a two-point enhancement under U.S.S.G. § 3C1.1 for obstruction of justice; (2) to outline for the Court the new Guidelines calculation; and (3) to set forth the government's revised sentencing recommendation.[3]

---

[1]    The defendant was found not guilty of Sexual Abuse in the Third Degree, in violation of NYPL § 130.55 (a Class B misdemeanor).

[2]    The additional evidence the government received that reveals the defendant's participation in the obstruction of the Bail Revocation Hearing consists of text message correspondence (described infra at Section II) recovered pursuant to a court-authorized search warrant executed on Adams's cellular telephone seized incident to her arrest.

[3]    As of this filing, the Probation Department has not issued an addendum to the Presentence Report based upon the additional information described herein because it is waiting for defense counsel's position.  To comply with the Court's rule that the government

2

II.     Evidence of the Defendant's Obstruction of Justice

The government attaches (and describes below) the additional evidence that proves the defendant's participation in the obstruction of justice described above.[4]

A.     Relationship Between the Defendant and Patricia Adams

Since at least 2014, Patricia Adams was a regular gambling customer at sports betting and card games controlled by the Bonanno crime family. (See, e.g., Ex. A (Complaint filed in United States v. Adams, 17-CR-636 (KAM) (E.D.N.Y.), ECF Dkt. No. 1), ¶ 7); Ex. B (text messages between Adams and a Bonanno family associate regarding poker games).)[5] Further, until approximately 2017, Adams was an editor and co-owner of The Forum, a community newspaper that covers, among other areas, the Howard Beach and Broad Channel neighborhoods in Queens, New York. (See, e.g., Ex. A, ¶ 9.) Through her work on the paper, Adams wrote flattering stories about the defendant and his businesses. (See, e.g., Ex. C (The Forum article by Adams dated Apr. 18, 2013 and titled "The All American Dream (Come True)" discussing the defendant's re-opening of his business after Hurricane Sandy as a "fairy-tale" and "inspiring the rebuilding of their town").)

---

submit its sentencing letter two weeks prior to sentencing, however, the government submits this letter today.

[4]     The government respectfully submits that the attached documentary evidence is sufficient to prove the defendant's obstruction of justice that warrants an enhancement under U.S.S.G. § 3C1.1, and therefore a hearing involving witness testimony is unnecessary. See, e.g., United States v. Phillips, 431 F.3d 86, 93 (2d Cir. 2005) (holding that no Fatico hearing was required where counsel opposed a sentencing enhancement in a letter and at sentencing because the "district court is not required, by either the Due Process Clause or the federal Sentencing Guidelines, to hold a full-blown evidentiary hearing in resolving sentencing disputes. All that is required is that the court afford the defendant some opportunity to rebut the Government's allegations" (internal quotation marks omitted)); see also United States v. Olvera, 954 F.2d 788, 792 (2d Cir. 1992) (upholding denial of Fatico hearing where the district court considered only documentary and physical evidence and the defendants "were given a full opportunity to argue their objections and to present any relevant evidence").

[5]     The government respectfully submits under separate cover a letter requesting permission to file certain exhibits under seal or in redacted form because they contain grand jury information, sensitive information about the Victim and her family and others' personal identifying information. In addition, on May 16, 2017, the Court ordered that the recording of the Meeting and corresponding transcript (defined below as Exhibits J and K) were subject to the Protective Order in this case, and therefore the government discloses such materials pursuant to that Order and requests that they also be filed under seal.

3

In addition, as demonstrated by text messages recovered from Adams's cellular telephone seized incident to her arrest, Adams was desperate for the defendant to help her set up a food business. (See Ex. D (text messages between Adams and the defendant) at 9 (message dated March 23, 2017, in which Adams asks the defendant to speak to two other potential partners about the business and stating, "Let me know because sooner than later I have to choose between a gun or a bottle of Zanax."); id. at 10 (message dated March 23, 2017, in which Adam states, "Rob please try to get me one season [of operating her business] out of them.").) When this venture did not work out, Adams told the defendant "I want you to know I know what you tried to do for me and I really appreciate it." (Id. at 11 (message dated March 27, 2017).) Throughout these exchanges, Adams made clear that she was extremely loyal to the defendant. (See, e.g., id. at 10 (message dated March 24, 2017, in which Adams said she told one of the potential business partners "I won't do anything without talking to 'the boss'. [Th]at would be you. Lol.").)

Given their relationship, when the defendant was arrested on the Federal Case on March 28, 2017, Adams used her position at The Forum to prevent negative publicity about the defendant. For instance:

- On March 28, 2017, a cell phone number saved in Adams's phone as the defendant's wife Jamie Pisani ("Jamie") texted Adams: "Hey pat it's Jamie. I'm sure you heard about rob. Wondering if by any chance you can reach out to the wave [another local paper based in Rockaway Beach, New York] to not have them print it. . . . I know it's already out there but at least wanna try to keep it out of local papers." (Ex. E (text messages between Adams and Jamie) at 1);

- On March 31, 2017, the defendant texted Adams, "Hey. Jamie told me that you tried to have them omit my name. Thanks. I don't mind the name so much. Just mainly the store. But appreciate the help." (Ex. D at 11.);

- On April 2, 2017, Adams texted Jamie, "my editor has done the story already but I've left Rob out of it. [I] have a Terrible relationship with the bosses at the wave but I am in very good terms with their editor. The chronicle [i.e., the Queens Chronicle, another local paper] on the other hand has already texted to ask if it's the same Rob that I was partners with. I'm going to talk to the publisher in the morning. And I may have some luck with him but I'll try extra hard at the wave. In the meantime I'll find a way to undue any local damage after this week if there is any." (Ex. E at 1 (emphases added).); and

- On April 4, 2017, Adams texted Jaime, "I called the wave and got the answer I expected. 'You know rob doesn't have a good relationship here' and apparently I wasn't the only one that called about it but none the less they wouldn't budge. Then I called 'my friend' Mark at the Chronicle who told me

4

they'd have to put the name in because it said 12 arrested in the press release and no one can be left out. <u>Needless to say I have two less working relationships</u>." (Ex. E at 2 (emphasis added).)

B. The Sexual Assault

As established at the trial on the State Case, on April 28, 2017, the defendant sexually assaulted the Victim at the All American Bagel and Barista, which he owned, managed and was permitted to travel to as part of his pretrial release on the Federal Case. (<u>See</u> Pretrial Services Memo., ECF Dkt. No. 102.) On May 4, 2017, the defendant was arrested by the New York City Police Department, and the next day, May 5, the Pretrial Services Agency for the Eastern District of New York requested a bail violation hearing and required that the defendant be placed on home incarceration pending the hearing. (<u>See</u> <u>id.</u>)

That same day (May 5), Adams texted Jamie asking if she was okay. (<u>See</u> Ex. E at 3.) Jamie replied, "Hi as good as could be. This is such bs. We have video footage to prove it. Can't believe someone would to this to us. And the media!"[6] (<u>Id.</u>) Adams replied, "[A]s far as the media is concerned – let's just say I'm not surprised. They are paper selling bottom feeders. But remember that I am one of them and she m [sic] this particular case I am in a position to possibly do something beneficial. I am not writing anything unless the atty feels it could be useful but <u>I can really zap any other local coverage</u>. . . . I know I can do an absolutely GREAT job on a piece like that but I don't want to do anything to get in the way . . . I will do anything to help with this." (<u>Id.</u> (emphasis added).) Jamie replied, "Thank you so much." (<u>Id.</u>)

On May 8, 2017, Adams asked Jamie if she could do anything to help. (<u>See</u> <u>id.</u>) Jamie said that the defendant was meeting with his attorney to see when he has "to go in front of judge to see if bail is remanded." (<u>Id.</u>) Adams later stated, "please let me know IF we need to handle this in the paper at all. I'd love to come out and say that these allegations are totally unsupported . . . I'd also like to do an editorial talking about how people can be ruined just from someone's untrue work. Let me know your thoughts please." (<u>Id.</u>) Jamie replied, "Rob said better not to say anything until it's settled. But I don't see why an editorial about how untrue words can hurt ppl would hurt. . . Not mentioning any names or anything. What do you think." (<u>Id.</u>) Adams replied, "I think that would always be a good thing. But in another sense it's only going to reach people already in the know. We r looking for mass appeal. . . I don't know. There are so many factors involved. And I

---

[6] On May 4, 2017, the New York Daily News and the New York Post published articles about the defendant's arrest on the State Case. <u>See</u> Keshner, "Mobster on trial cuffed outside court for unrelated sex assault," <u>N.Y. Daily News</u> (May 4, 2017), <u>available at</u> http://www.nydailynews.com/new-york/nyc-crime/mobster-trial-cuffed-court-unrelated-sex-assault-article-1.3137628; Celona <u>et al.</u>, "Married 'mobster' accused of sexually assaulting woman," <u>N.Y. Post</u> (May 4, 2017), <u>available at</u> https://nypost.com/2017/05/04/married-mob-associate-accused-of-sexually-assaulting-woman/

5

certainly don't want to make any mistakes." (Id. at 4.) Adams stated, "Let me know when you found out about bail PLEASE." (Id.)

On May 10, 2017, the Court scheduled the Bail Revocation Hearing for May 16, 2017, at 2:30 p.m. (See Order, ECF Dkt. No. 103.)

        C.        The Scheme to Obstruct

Between March 31, 2017 and May 12, 2017, the defendant and Adams did not exchange any text messages. (See Ex. D.) On May 12, after the Bail Revocation Hearing was scheduled, the defendant texted Adams, "Hey pat. Jamie told me you have been asking about me. They are trying to take away my bail over [t]his persons [sic] word. And that I am a bad person. I have over 20 character letters." (Id. at 11.) The defendant then asked Adams if she would help procure a character letter from another individual. (See id. at 11-12.) The defendant also stated, "I have to fight for my freedom again this Tuesday [i.e., at the May 16, 2017 Bail Revocation Hearing]. For another crime I didn't commit."[7] (Id. at 12.) Adams replied, "I mean who is this sick bitch that she just pulls something like this. I'm sure it was for one reason alone and [t]hats to get some money." (Id.)

At this point, the defendant described the Victim to Adams, saying "I heard she is the girl who called the cops when someone named David Barone was touching himself outside her house? By Charles park?" (Id.) Adams replied, "Wait a minute rob" and the defendant continued to make disparaging remarks about the Victim. (Id.)

David Barone was a familiar name to Adams. In June 2016, the Victim's father reported a "peeping Tom" named David Barone outside of his home and spoke to Adams, who ended up writing an article in The Forum about the incident. (See Ex. F at 9; Ex. G (June 27, 2016 article by Adams regarding Barone).)

On May 12, 2017, at 5:07 p.m. – just four minutes after the defendant told Adams that the Victim had reported an incident about "David Barone," which prompted Adams to write, "Wait a minute rob" – Adams stopped texting the defendant and instead texted Jamie. Adams wrote, "Jamie <u>I need to speak with you and rob right away</u>. I'm texting with rob now but <u>I can't say what I need to by text</u> but he just told me something and <u>I think I might be able to help with this one</u>." (Ex. E at 4 (emphases added).) Toll records for Adams's cell phone reveal that nine minutes later, at 5:16 p.m., Jamie's cell phone called Adams's cell phone, and the call lasted 21 seconds. (See Ex. H (toll records for Adams's telephone number produced by Verizon Wireless) at row 90; see also Ex. H-1 (explanatory sheet provided by Verizon Wireless).)

---

       [7]       This was prior to the defendant's guilty plea in the Federal Case for conspiracy to collect an unlawful debt through his association with the Bonanno crime family.

6

After this conversation, Adams attempted to contact the Victim's father. Toll records reveal that on May 13, 2017, at 7:38 p.m., Adams called the Victim's father's cell phone number, and they spoke for six minutes and 32 seconds. (See Ex. H at row 68; Ex. F at 20 (providing the Victim's father's telephone number).) At 7:46 p.m. – less than a minute after the call to the Victim's father concluded – Adams texted Jamie's cell phone, stating, "<u>I finally got in touch.</u> I am meeting with him in the morning. He knew what I was calling about. I am sure he just thinks I know about everything that happens. I hope my plan works. <u>Let you know tomorrow.</u> Calling at 10[] to choose a meeting place." (Ex. E at 4 (emphases added).) According to the Victim's father, when she contacted him, Adams said that she wanted to meet but refused to do so at either of their homes and instead suggested meeting at Starbucks in Howard Beach. (See Ex. F at 12.)

### D.     The Obstruction

On Sunday, May 14, 2017, at approximately 1:20 p.m., Adams met with the Victim's father at Starbucks (the "Meeting"). (See Ex. I (text messages between Adams and the Victim's father).) Unbeknownst to Adams, the Victim's father recorded the meeting with his cell phone. During the Meeting, which lasted approximately two and one-half hours, Adams described her relationship to the defendant and the Bonanno crime family, the fact that she had been sent to speak with the Victim's father and repeatedly threatened the Victim if she were to continue to cooperate with law enforcement, including by testifying at the upcoming Bail Revocation Hearing.

#### 1.     <u>Adams Stated She Was Acting Not Only On Her Own Behalf</u>

During the Meeting, Adams stated that she was not acting solely of her own accord. Rather, toward the beginning of the Meeting, Adams recounted a conversation she had after the defendant was arrested for the alleged sexual abuse, which was published in local newspapers, and stated:

> I haven't written anything about it. . . It was The Post and The News. And when I got the phone call, [deeper voice] 'You better fucking fix this!' 'I better fix it? What are you? . . . Hang on. You mind if I figure out what the fuck happened?' 'You got a week.' 'Thank you' [noise hitting the table].

(Ex. J (audio file of the Meeting) at 0:33:48 – 0:34:15); Ex. K (transcript of the Meeting) at 22.)

Similarly, Adams stated that she had to "answer" to people other than herself:

> Listen, I'm not making any mistake about the fact that I'm here to try and help myself . . . I'm worried about this one, and who I have to answer to.

7

(Ex. J at 2:24:34 – 2:25:07; Ex. K at 96.)

In fact, Adams stated that she was there because she owed debts to other people:

> Listen, I'm not having this conversation with you easily. I've been doing my homework since the day that it happened, because, as I explained, I have a personal, personal liability . . . And it's aside from the fact of what I have to do with the newspaper. I'm on the verge of—I've been trying to get out for two years. But because of certain obligations, I'm forced to stay. <u>I'm kind of under their . . . thumb</u>.

(Ex. J at 0:29:02 – 0:29:40; Ex. K at 18 (emphasis added).)

### 2. Adams's Described Her Relationship With the Defendant and the Bonanno Crime Family

In addition to stating that she was sent by others, Adams referenced her connection to the defendant, including a conversation with the defendant's lawyer, her knowledge of the defendant's criminal case, and her review of video recordings from inside the deli showing the Victim's actions after the sexual assault. For instance, during one part of the recording, Adams stated:

> Let me put it to you this way: here's a guy . . . here's a guy out of ten defendants who is the only one that stands a shot for getting probation 'cause they have nothing on tape, they have nothing on the phone, they have zero involvement – zero involvement on him. They went back as far as 2012 – they have nothing on him. Okay? Unfortunately for him, he gave someone a job, one of the other defendants, and they automatically associate. <u>I had dinner with them on a regular basis</u>, I'm surprised I wasn't in the lineup. Okay? <u>But he's the only guy that stands a shot to get off, as per his lawyer</u>.

(Ex. J at 0:35:24 – 0:36:10; Ex. K at 23.)

### 3. Adams Repeatedly Threatened the Victim

Throughout the Meeting, Adams repeatedly threatened the Victim's father about the negative consequences that the Victim would suffer if she were to continue to cooperate with law enforcement and testify at the upcoming Bail Revocation Hearing. For instance, Adams stated:

8

- "[The Victim] is going to hurt herself.  That's the truth.  I'm going to hurt her and, and I don't want you to.  You know, I gotta put out what I have to put out. . . . And then everybody is going to come on the fucking bandwagon, and it's going to be a fucking  . . . there's no way, listen there's no winners. . . . There's no winners.  You should talk to her again, and see what she says to you . . . ." (Ex. J at 1:34:21 – 1:34:50; Ex. K at 62-63.);

- "[I]f they get her – and she signs these statements and she goes up before the lawyers – they're going to shred her like they put her through a Cuisinart." (Ex. J at 1:46:20 – 1:46:30; Ex. K at 71.);

- "It only matters once she crosses the threshold and signs the paper that says she is going through with it - none of it matters anymore." (Ex. J at 1:32:23 – 1:32:33; Ex. K at 61.);

- "I'm going to tell you what is going to happen.  If she chooses to follow the direction of the agents and the FBI and sign these papers . . . [i]t's not going to be good for her publicly." (Ex. J at 19:44 – 20:02; Ex. K at 13.);

- "I won't hurt you, if you don't deserve – that's for my enemies.  I will not hurt you . . . but in the newspaper, thoroughly thoroughly objective . . . For my good, for everybody's good – I'm hoping that she'll decide to drop it." (Ex. J at 1:03:21 – 1:03:56; Ex. K at 44.);

- After telling the Victim's father she reviewed the evidence in the case, Adams stated:  "I would never in a million years come talk to you unless my arsenal was fully loaded. . . .  It is my position, and I don't fuck with it.  I don't make empty promises, and I don't make empty threats.  I never tell you, 'Oh, I got this, and I got that'—I got it." (Ex. J at 1:31:32 – 1:32:00; Ex. K at 61.); and

- "[I]n my experience, if she goes through with this – she's not gonna work anywhere around here." (Ex. J at 1:00:08 – 1:00:16; Ex. K at 42.).

Adams also made clear that the Victim would suffer publicly even if it was true that the defendant had sexually abused the Victim:

- "It's one big malicious circus, that is what it is, and there are no winners, least of all her.  <u>She could be 100% right</u> – he could have unsnapped her bra, tried to push her head down, whatever, she can't win.  There are no winners.  But like I said, completely separate from the fact that personally, I don't know, I don't believe that it happened." (Ex. J at 1:40:36 – 1:41:04; Ex. K at 68 (emphasis added).);

9

- "[S]he's gonna put herself in a very bad position.  Even if she's – and I'm not saying that she is – but <u>even if she's 100 percent right, and it happened, I wouldn't deal with it either way</u>.  Because the ramifications for her, publicly – meaning, it's – we don't live in a world where somebody tries to force you to do something, and you tell about it, and you're proven right – right? . . . Even if that happens, you're never gonna be – not that I'm saying this is her objective – but you're never gonna be elevated, you're never gonna win, you're never gonna be popular, you're never gonna achieve anything.  And then, ain't it horrible to think – that you could be proven right, and then you go out into the world, and you think you're a [UI] with your mouth, with this, with that, with the other thing.  It's a no win – it's a winless situation – whichever way you choose." (Ex. J at 1:05:59 – 1:07:19; Ex. K at 45-46.);

- "[A]s a completely unqualified, casual observer, if what she said gets out and what she actually did follows it, she's gonna be ruined.  Obviously, nobody is going to believe that and they're gonna look at her like, 'What the fuck did you do that for?'"  After the Victim's father said that his daughter was not a "liar," Adams replied, "She doesn't have to be a liar." (Ex. J at 0:29:55 – 0:30:27; Ex. K at 19.); and

- "[T]here's a number of reasons why she could be nervous.  The whole situation, it would make me nervous.  <u>Whether she's lying or she's not</u> – and if she's not, I would be very nervous – if that happened.  That's a horrible thing to happen.  On whatever level." (Ex. J at 2:10:29 – 2:10:46; Ex. K at 87-88 (emphasis added).).

Adams also stated that the entire point of the Meeting was to convince the Victim not to cooperate with law enforcement, including by testifying at the upcoming Bail Revocation Hearing:

- "But I am in a position—I'm being very honest—I am in a position where I am going to have to expose the whole situation—<u>if we get to that point</u>." (Ex. J at 0:25:18 – 0:25:31; Ex. K at 16 (emphasis added).);

- "I agreed with myself to have a conversation with you. . . . If I didn't think that you were a reasonable man, I wouldn't talk to you, because, because what I will I accomplish . . . . I'd be wasting my time." (Ex. J at 1:07:35 – 1:07:46; Ex. K at 46-47.);

- "[W]ait until tomorrow, don't do it today.  Don't upset your wife, don't upset your daughter today [<u>i.e.</u>, Mother's Day] – but just have a word with her.  If she wants at any point to speak with me, I am more than happy to talk with her.  Not that I think she would want to." (Ex. J at 1:54:25 – 1:54:42; Ex. K at 77.);

10

- "I have one objective – very honestly.  For my good, for everybody's good – I'm hoping that she'll decide to drop it." (Ex. J at 1:03:44 – 1:03:56; Ex. K at 44.); and

- "I'm hoping that you and I during this conversation can find a way not to reach that position." (Ex. J at 0:25:31 – 0:25:40; Ex. K at 16.).

To convince the Victim not to testify, Adams also claimed that federal law enforcement officials were untrustworthy and would not protect the Victim:

- "And they're looking, these feds.  Listen:  one day, they're your friend and they'll take you in, they'll tell your daughter, 'Oh [Victim], you gotta help us, it's the right thing to do, you gotta do this, we'll protect you.'  Let me tell you something right now.  Protect you?  They will sell your ass out quicker again and again.  They are the worst scum of the earth.  The worst. . . . . But making a deal with them is making a deal with the worst devil." (Ex. J at 26:09 – 26:35; 26:58 – 27:03; Ex. K at 16-17.)

- "Federal law enforcement agents, U.S. Attorney, any number of – they are the most deceitful misleading bunch of tyrants on the face of the earth.  And that's the truth.  You don't have to take my word for it." (Ex. J at 55:59 – 56:17; Ex. K at 40.); and

- "And if you think that those motherfuckers on the other side [i.e., law enforcement] are going to protect her, you're out of your mind. . . .They got what they wanted." (Ex. J at 1:46:30 – 1:46:38; Ex. K at 71.).

   E.   Contacts After the Obstruction

The Meeting ended at approximately 4:00 p.m. on May 14, 2017.  At 8:27 p.m. that day, Adams texted the defendant, "Hey rob happy Mother's Day.  Lol.  I had the business meeting I was telling you about today.  I'll stop over tomorrow to talk to you and show you the menu if that's ok." (Ex. D at 12.)  The defendant replied, "Ok." (Id.)  Adams said, "Thanks.  C y tom [i.e., See you tomorrow]." (Id.)  The defendant and Adams had not texted about any business venture for approximately eight weeks, since March 27, 2017.  And the result of those previous discussions was that the defendant was not able to help Adams open her business.  (See, e.g., id. at 11 (text message dated March 27, 2017 in which Adams stated, "I also feel like I got screwed on many ends. . . . But I want you to know I know what you tried to do for me and I really appreciate it.").)

On Monday, May 15, 2017 – the day before the Bail Revocation Hearing – at 10:21 a.m., the defendant texted Adams, "Hey.  Maybe just show my brother the menu.  He

11

is at the store today."[8] (Id. at 12.) Three minutes later, Adams replied, "Whatever you like. That's fine." (Id.) At 3:09 p.m. that day, Adams called a number that is advertised online as belonging to the All American Bagel & Barista. (See Ex. H at row 25; Ex. L (screenshot from www.bagelbarista.com (last visited July 9, 2018)).) At 4:58 p.m., Adams texted the defendant, "Hey I'm leaving Al [i.e., the defendant's brother Alex] now. Took care of the whole menu. Rob Good Luck tomorrow." (Ex. D at 12.) The defendant replied, "Thank you." (Id.) Later that evening, the defendant thanked Adams for writing a letter to be submitted in opposition to the government's motion to revoke his bail.[9] (See id. at 13.) Adams replied, "You're very welcome. I only just started." (Id. (emphasis added).)

    F.    Bail Revocation Hearing

The government learned of Adams's obstruction on the morning of May 15, 2017 through the Victim's father. On May 16, 2017, the government provided copies of the recording of the Meeting to defense counsel and the Court in advance of the Bail Revocation Hearing. (See Ex. M (Transcript of Bail Revocation Hearing).) Defense counsel subsequently requested an adjournment, and the Court postponed the Bail Revocation Hearing until May 24, 2017, ordering the defendant to remain on home confinement. (See id. at 15-20.) At the conclusion of the Bail Revocation Hearing, defense counsel represented that "at the outset of the state court proceeding, Mr. Pisani sent an e-mail to all of his employees encouraging them that they should all stay away from the victim, her family, anything related to that even if they thought they might be helping him, the best way they can help him would be to continue to go to work and do what they are supposed to do and not interfere with her in any way so he did take that step." (Id. at 23.) Defense counsel did not mention any similar admonitions the defendant made to non-employees.

After the Bail Revocation Hearing, Adams texted Jaime, "Hi Jam I don't want to b[o]ther u but I want to know how it went today." (Ex. E at 4.) Jamie replied, "Postponed til 24th," to which Adams replied, "Great prolong the agony." (Id.)

Thereafter, the parties agreed that until the State Case was resolved, the defendant would remain on home confinement with certain limited exceptions. (See June 2, 2017 Def. Ltr., ECF Dkt. No. 117.) On June 13, 2017, the Court therefore canceled the Bail Revocation Hearing. (See ECF Order dated June 13, 2017.)

---

    [8]    As a result of his arrest on the State Case, the defendant had been placed on home incarceration and was not permitted to visit his places of employment anymore. (See Pretrial Services Memo.).

    [9]    Prior to the Bail Revocation Hearing, counsel disclosed certain defense exhibits he intended to use in response to the government's revocation motion, including over 20 character letters. He did not include a letter from Adams.

G. Adams's Prosecution and Guilty Plea

On August 16, 2017, Adams was arrested on a complaint charging her with witness tampering, in violation of 18 U.S.C. § 1512(b)(1). (See Ex. A; United States v. Adams, 17-CR-636 (KAM) (E.D.N.Y.), ECF Dkt. No. 4.) She was indicted by a grand jury on November 15, 2017, for obstruction of justice and three different types of witness tampering, in violation of 18 U.S.C. §§ 1503(a), 1512(b)(1), 1512(b)(2), 1512(c) and 1512(d). (See Ind., id., ECF Dkt. No. 18.)

On June 26, 2018, Adams pleaded guilty pursuant to a plea agreement to a superseding information charging misprision of a felony, in violation of 18 U.S.C. § 4. (See S-1, id., ECF Dkt. No. 42.) Specifically, Adams admitted she had "knowledge of the actual commission of a felony," that is, "an attempt to tamper with a witness, in violation of Title 18, United States Code, Section 1512(d)," and did "knowingly and intentionally conceal and did not as soon as possible make known the same to" law enforcement. (Id.) As part of her plea allocution, Adams admitted that in "May of 2017, I was aware that another person attempted to harass and sway[] an individual from testifying at a bail revocation hearing in the United States District Court for the Eastern District of New York," and she concealed such information. (Ex. N (Transcript of June 26, 2018 Plea Hearing) at 18.) Adams further confirmed that she knew "that a felony had actually been committed," and that that felony "involve[d] an attempt to tamper with a witness or to influence or chill a witness'[s] statements before court." (Id. at 19.)

II. The Defendant's Misconduct Warrants an Obstruction of Justice Enhancement

A. The Evidence Outlined Above Reveals the Defendant Participated in a Conspiracy and Attempt to Obstruct the Bail Revocation Hearing

Through the evidence detailed above and attached hereto, the government respectfully submits that it has proven by a preponderance of the evidence that the defendant, with the intent to obstruct the prosecution and sentencing in the Federal Case, knowingly participated in a plan in which Adams approached the Victim's father and, with corrupt intent, harassed him in an attempt to dissuade the Victim from cooperating with law enforcement, including by testifying at the Bail Revocation Hearing.

There can be no question that Adams in fact attempted to obstruct the Bail Revocation Hearing. Adams's actions at the Meeting were obviously intended to harass the Victim's father and corruptly persuade the Victim from cooperating with law enforcement, including by testifying at the Bail Revocation Hearing. She explicitly and repeatedly threatened to harm the Victim (through her reporting at The Forum and otherwise) if she were to testify, even if the defendant had in fact assaulted the Victim. All of this constitutes attempted obstruction of justice and witness tampering.[10]

---

[10] See 18 U.S.C. § 1512(b)(1) ("Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so . . . with intent to (1) influence,

13

The only issue is whether the defendant was a knowing participant in the conspiracy and attempt to obstruct the Bail Revocation Hearing. The answer can only be yes for a variety of reasons.

First, the defendant was the person who had the most to gain from Adams's obstruction. He was the person who faced the possibility of (1) being remanded into custody at the Bail Revocation Hearing, (2) being convicted of another crime in the State Case, (3) being held liable for violating the terms of his release on the Federal Case, including the prospect of his family home being foreclosed upon; and (4) having his punishment on the offenses underlying Federal Case increased. All of Adams's threats primarily acted to help the defendant. It is therefore illogical to think that Adams would seek out the Victim's father, attempt to obstruct the Bail Revocation Hearing (exposing herself to serious criminal liability) and keep the defendant out of jail without the defendant's knowledge and consent. This is reinforced by Adams's reluctance to ever act on the defendant's behalf without his express consent. (See, e.g., Ex. D (text messages between Adams and the defendant) at 10 (message dated March 24, 2017, in which Adams said she told one of the potential business partners "I won't do anything without talking to 'the boss'.").)

Second, the text messages and toll records detailed above reveal the defendant's involvement in the formation of the obstruction scheme. On May 12, 2017, after the Bail Revocation Hearing had been scheduled, the defendant reached out to Adams for the first time in six weeks and described the Victim to Adams. And he did so by referencing the subject of one of Adams's prior articles, stating, "I heard she is the girl who called the cops when someone named David Barone was touching himself outside her house? By Charles park?" (Ex. D at 12.) Adams replied, "Wait a minute rob." (Id.)

At this moment, at the defendant's prompting, Adams realized that she knew the Victim's father through her reporting in The Forum of the David Barone incident when he reported a "peeping Tom." (See Ex. F at 9; Ex. G (The Forum article by Adams dated June 27, 2016 regarding Barone).) Recognizing that she could speak to the Victim's father and attempt to dissuade the Victim from testifying, Adams stopped texting the defendant and instead contacted his wife's cell phone, stating, "Jamie I need to speak with you and rob right away. I'm texting with rob now but I can't say what I need to by text but he just told me something and I think I might be able to help with this one." (Ex. E at 4 (emphases added).)

---

delay, or prevent the testimony of any person in an official proceeding; [or] (2) cause or induce any person to (A) withhold testimony . . . from an official proceeding" shall be punished); § 1512(c) ("Whoever corruptly . . . (2) . . . obstructs, influences, or impedes any official proceeding, or attempts to do so" shall be guilty of a crime); § 1512(d) ("Whoever intentionally harasses another person and thereby . . . dissuades any person from (1) . . . testifying in an official proceeding; [or] (2) reporting to a . . . judge of the United States the commission . . . of a Federal offense or a violation of conditions of . . . release pending judicial proceedings . . . or attempts to do so," shall be guilty of a crime.).

Toll records for Adams's cell phone reveal that nine minutes later, at 5:16 p.m., the cell phone number saved under Jamie's name called Adams and the two spoke for 21 seconds. (See Ex. H at row 90.)

This proves that after the defendant pointed out Adams's relationship to the Victim's family, Adams spoke with the person using Jamie's cell phone about the plan to contact the Victim's father. And Adams's statement that she cannot speak to the defendant directly, and cannot "say what I need to by text," indicate that she planned to do something improper, if not illegal, and avoid detection.[11]

Third, the evidence reveals that Adams kept the defendant and/or his wife up to speed on her contacts with the Victim's father, which also support a finding that the defendant was a knowing participant in the conspiracy and attempt to obstruct the Bail Revocation Hearing. For instance, after Adams spoke with Jamie's cell phone, toll records reveal that she called the Victim's father's cell phone number on May 13, 2017, at 7:38 p.m., and they spoke for six minutes and 32 seconds. (See Ex. H at row 68.) Less than a minute after that call concluded, Adams texted Jamie's cell phone, stating, "I finally got in touch. I am meeting with him in the morning. He knew what I was calling about. I am sure he just thinks I know about everything that happens. I hope my plan works. Let you know tomorrow. Calling at 10[] to choose a meeting place." (Ex. E at 4 (emphases added).)

The fact that Adams told the person using Jamie's cell phone that she "finally got in touch," without any context, proves that Adams had relayed her plan to contact the Victim's father. And her statement "Let you know tomorrow" reveals that Adams was not acting on her own but was to provide an update after the Meeting. At no point did the defendant or Jamie express surprise, confusion or otherwise object to Adams's actions.

Adams did in fact update the defendant after the Meeting with the Victim's father. In the evening of May 14, Adams used the coded phrase, "I had the business meeting I was telling you about today. I'll stop over tomorrow to talk to you and show you the menu if that's ok," which prompted the defendant to say, "Ok." (Ex. D at 12.) After months of texting about Adams's potential business between November 2016 and March 27, 2017, Adams and the defendant did not exchange any messages relating to a restaurant or "menu" until this May 14 message. And those earlier messages reveal that the defendant was unable to help Adams open her food business. At no point did Adams discuss any "business meeting" scheduled for May 14 or the need to show the defendant any "menu." This is a (poorly) coded reference to Adams's meeting that day with the Victim's father, and the defendant's involvement in the obstruction scheme.

---

[11] During the Meeting, when discussing the strength of the government's case against the defendant's co-defendants in the Federal Case, Adams asserted, "Me, I wouldn't put anything on my phone. Even an innocent thing. . . . I watch everything I text. Listen, I'm in a position where I have a lot of people looking over both shoulders." (Ex. J at 0:14:10 – 0:14:23; Ex. K at 10.)

15

The defendant initially agreed that Adams could come to his home (where he was confined) but later suggested that she show his "brother the menu" at the "store," which Adams did. (Ex. D at 12.) Yet throughout the defendant and Adams's earlier business discussions, they never mentioned the defendant's brother. This is yet another coded attempt to discuss the obstruction and have Adams meet with a third party (here, the defendant's brother) rather than the defendant directly on the day before the Bail Revocation Hearing. Indeed, Adam's statement that she "[t]ook care of the whole menu" makes no sense, especially since she immediately thereafter wished the defendant "Good Luck tomorrow." (Id. at 12.) And later that evening, the defendant thanked Adams for "that letter" her "taking the time to write that"—but the defense never submitted a character letter written by Adams. Rather, Adams's concluding remark shows this is another reference to the obstruction scheme – "You're very welcome.  I only just started."  (Id. at 13 (emphasis added).)

Fourth, Adams's statements during the Meeting (when she did not know she was being recorded) reveal she was acting on the defendant's behalf and with his knowledge. As detailed above, Adams repeatedly referenced her connection to the defendant, including her knowledge of the evidence against him in the Federal Case. But with respect to the Meeting itself, Adams said:

> And when I got the phone call, [deeper voice] 'You better fucking fix this!' 'I better fix it?  What are you? . . . Hang on. You mind if I figure out what the fuck happened?' 'You got a week.' 'Thank you' [noise hitting the table].

(Ex. J at 0:33:53 – 0:34:14; Ex. K at 22). This description of a phone call (and being told by someone with a deeper voice "You better fucking fix this!") is a reference to speaking with the defendant about the plan to contact with the Victim's father. It is also consistent with the fact that Jamie's cell phone called Adams's just minutes after Adams realized her connection to the Victim's father and texted Jamie's cell phone, "I need to speak with you and rob right away. I'm texting with rob now but I can't say what I need to by text but he just told me something and I think I might be able to help with this one." (Ex. E at 4; Ex. H at row 90.)

Finally, Adams's plea allocution demonstrates that she was not acting alone. She admitted that she was aware that "another person attempted to harass and sway[] an individual from testifying at a bail revocation hearing," and that she concealed such information from law enforcement. (Ex. N at 18-19.) The government submits that this "other person" is the defendant. Although Adams also participated in the obstruction and witness tampering, these sworn statements also prove the defendant's involvement in those offenses.[12]

---

[12] Because the Confrontation Clause does not apply at sentencing proceedings, the Court may take into account these statements of a co-conspirator. See generally United States v. Martinez, 413 F.3d 239, 242-43 (2d Cir. 2005) (Sotomayor, J.) ("Both the Supreme Court and this Court . . . have consistently held that the right of confrontation does not apply

16

\*\*\*

In sum, the evidence detailed above proves by more than a preponderance of the evidence that the defendant was a knowing participant in the conspiracy and attempt to obstruct the Bail Revocation Hearing. See Sand, Modern Federal Jury Instructions ¶ 73.01, at 73-2 (stating that to satisfy the preponderance standard, the evidence need only be sufficient to cause the evidentiary "scales [to] tip, however slightly" in favor of the asserted fact). The text messages, toll records, recording of the Meeting and plea allocution all reveal the defendant knew of and sanctioned the attempt to harass the Victim's father and corruptly persuade the Victim not to cooperate with law enforcement.

B. This Misconduct Warrants a Two-Point Enhancement Under U.S.S.G. § 3C1.1

If the Court finds that the defendant intended to obstruct the Bail Revocation Hearing and was part of the attempt to do so, then it should also increase the defendant's total offense level by two points under U.S.S.G. § 3C1.1.

That provision applies if "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense."

As to obstructing the administration of justice "with respect to the . . . prosecution . . . of the instant offense," the defendant's participation in a conspiracy and attempt to tamper with the Victim in advance of the Bail Revocation Hearing was a corrupt attempt to remain on pretrial release during the instant Federal Case. This relates to the "prosecution" of the Federal Case because "a defendant's falsely obtaining bail always has the potential to impede the prosecution of the offense charged due to the inherent risk that a defendant on bail may not appear in court as scheduled." United States v. Gumbs, 286 F. App'x 763, 764-65 (2d Cir. 2008) (summary order) (upholding application of the enhancement under § 3C1.1 where the defendant lied about his citizenship and immigration status "in order to obtain release on bail"); see United States v. Mafanya, 24 F.3d 412, 415 (2d Cir. 1994) (upholding application of obstruction enhancement where the defendant appeared under a false identity at his presentment in the "hope of being released on bail"); see also United States v. Baez, 944 F.2d 88, 90 (2d Cir. 1991) (observing that the district court could have imposed a "two-level adjustment under section 3C1.1 for [the defendant's]

---

to the sentencing context and does not prohibit the consideration of hearsay testimony in sentencing proceedings."); accord United States v. Colasuonno, 697 F.3d 164, 177 (2d Cir. 2012); see also United States v. Asaro, 17-CR-127 (ARR) (E.D.N.Y.), ECF Dkt. No. 135 (transcript of sentencing in which the court found that the defendant committed a murder, in part, because a co-defendant had pleaded guilty to moving the body).

17

false testimony at the hearing at which his bail was revoked"). If lying to obtain bail constitutes obstruction of the prosecution, then so does attempting to obstruct a bail revocation hearing. Indeed, the application notes to Section 3C1.1 instruct that the enhancement is not limited to obstructing the trial. See U.S.S.G. § 3C1.1 app. n.4(A) (stating generally that the enhancement applies to "unlawfully influencing a . . . witness . . . directly or indirectly, or attempting to do so"); id. app. n.4(I) (stating generally that the enhancement applies to "other conduct prohibited by obstruction of justice provisions under Title 18, United States Code (e.g., 18 U.S.C. 1510, 1511)").

In addition, the defendant's misconduct constitutes obstructing the administration of justice "with respect to the . . . sentencing . . . of the instant offense." Under the Sentencing Guidelines, any sentence imposed prior to sentencing on the Federal Case affects the defendant's criminal history score. See U.S.S.G. § 4A1.2(a)(1) (stating that any "prior sentence" means "any sentence previously imposed upon adjudication of guilt . . . for conduct not part of the instant offense"); see also id. § 4A1.2(a)(4) (instructing that where "a defendant has been convicted of an offense, but not yet sentenced, such conviction shall be counted as if it constituted a prior sentence under § 4A1.1(c) if a sentence resulting from that conviction otherwise would be countable").

By participating in the conspiracy and attempt to tamper with the Victim in connection with the Bail Revocation Hearing, the defendant intended to interfere with his sentencing in the Federal Case because preventing the Victim from cooperating with law enforcement, including the state authorities, would likely prevent him from being convicted of another crime prior to sentencing on the Federal Case. If so, this would prevent his criminal history score (and therefore his Sentencing Guidelines range) from increasing. Indeed, given the guilty verdict in the State Case, the defendant's Criminal History Category has increased from I to II.

III. The Revised Sentencing Guidelines Calculation

In light of the foregoing, the government respectfully submits that the following Guidelines calculation should be applied:

| | |
|---|---|
| Base Offense Level (§ 2E1.1(a)(1)): | 19 |
| Plus: Obstruction of Justice (§ 3C1.1): | +2 |
| Less: Minor Participant (§ 3B1.2(b)): | -2 |
| Less: Timely Acceptance of Responsibility (§ 3E1.1): | -3 |
| Total Offense Level: | <u>16</u> |

As the defendant is now in Criminal History Category II because of his conviction on the State Case, the new Guidelines range is 24 to 30 months' imprisonment.[13]

IV.     The Section 3553(a) Factors and the Government's Revised Sentencing Recommendation

The defendant's commission of a sexual assault while on pretrial release in the Federal Case as well as his attempt to obstruct the Bail Revocation Hearing affect the Court's balancing of the Section 3553(a) factors, and in the government's estimation, warrant a sentence of 30 months' imprisonment.

This misconduct sheds further light on the defendant's "history and characteristics." 18 U.S.C. § 3553(a). Despite counsel's attempt to paint the defendant as "an exceptionally giving individual to family, friends, and the community at large" (Def. Sentencing Memo., ECF Dkt. No. 297, at 10), the facts outlined above demonstrate his abuse of power and disregard for the well-being of others. Less than five weeks after his arrest on federal racketeering charges, the defendant took advantage of a younger female employee and sexually assaulted her. And he did so knowing that was a violation his pretrial release, thereby jeopardizing his family home and his friend's home that had been posted as collateral. Unhappy at the prospect of being held accountable for his misconduct, the defendant attempted to subvert the judicial process and have an associate threaten the Victim's father—all in an effort to prevent the Victim from testifying against him at the Bail Revocation Hearing. The defendant is an unrepentant criminal whose varied misdeeds warrant significant punishment. (Cf. id. at 13 (asserting that the defendant's "regret" in committing the instant offense "is, perhaps, best evidenced by the fact that his conduct ceased in early 2013, some four years prior to his arrest and more than five years prior to the date of sentencing. In the ensuing years, Pisani's character of kindness, support of others, and his devotion to his community have flourished").).

A sentence of 30 months in prison is also required to "promote respect for the law." Id. § 3553(a)(2)(A). No crime undermines the integrity of the criminal justice system like obstruction of justice and witness tampering. Violating the trust of the Court by committing a serious offense while on pretrial release also imperils respect for the law. To send a message that such misconduct will not be tolerated, the Court should impose a significant incarceratory sentence. The defendant is not above the law.

Finally, the defendant's actions make plain that a significant prison sentence is required to deter him from committing future crimes. See id. § 3553(a)(2)(B), (C). The

---

[13]     The government recognizes that the Probation Department originally calculated the defendant's total offense level as 16 because it does not believe that a mitigating role adjustment is appropriate under U.S.S.G. § 3B1.2(b). If this is correct, then the revised total offense level should be 18, which, given the new Criminal History Category, yields a Guidelines range of 30 to 37 months' imprisonment.

19

defendant claimed in his sentencing submission that "his history since 2012 is powerful evidence that he is not likely to find himself in trouble of this sort ever again." (Def. Sentencing Memo. at 15.) But that is belied by the record. He is a repeat offender with multiple convictions who has thus far avoided any jail time. And the defendant's arrest on the Federal Case meant nothing to him. He did not stop committing crimes, and when caught, chose to commit another by attempting to tamper with a witness. The defendant's actions have proven that only a substantial term of imprisonment will keep him from committing further crimes.

V.  Conclusion

For the foregoing reasons, the government respectfully submits that the Court should sentence the defendant to 30 months' imprisonment.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By: _____/s/_____
Lindsay K. Gerdes
Keith D. Edelman
Assistant U.S. Attorneys
(718) 254-6155/6328


cc: Clerk of Court (DLI) (by ECF)
Seth Ginsberg, Esq. (by ECF and E-mail)
Jennifer G. Fisher, U.S. Probation Officer (by E-mail)