S E T H   G I N S B E R G
A T T O R N E Y   A T   L A W

July 31, 2018

The Honorable Dora L. Irizarry
Chief Judge
United States District Court, E.D.N.Y.
225 Cadman Plaza East
Brooklyn, New York 11201

**Re:**     *United States v. Pisani, et al.* **17-CR-155 (DLI)**

Dear Chief Judge Irizarry:

This letter is submitted on behalf of Robert Pisani in connection with his sentencing, scheduled for August 7, 2018. Though he maintains his innocence in connection with the charges on which he was tried in Queens County Criminal Court (the "State Case"), given his conviction, Pisani agrees with the government and Probation that he is now in Criminal History Category II. Pisani, however, does not agree with the government and Probation regarding the applicability of an offense level increase for obstruction of justice. Accordingly, for the reasons discussed below, Pisani maintains that his offense level pursuant to the United States Sentencing Guidelines is 14, which, in CHC II, has an advisory range of imprisonment of 18-24 months. Pisani otherwise urges the Court to reject the government's arguments.

**The State Case**

With respect to the State Case, while Pisani understands that the Court must accept the jury's verdict for purposes of calculating his criminal history score, he nonetheless wants the Court to appreciate certain facts regarding the State Case, which are relevant to the Court's assessment of the factors under 18 U.S.C. § 3553(a).[1]

The State Case is a classic "He said/She said" case that, unfortunately for Pisani, was tried at the height of what has been termed the "Me Too Movement," which does not diminish the severity of the allegations but does increase the difficulty a defendant faces in defending against such allegations in the current climate.

The entirety of the evidence offered against Pisani was the testimony of the complaining witness (the "CW"), who appeared at trial six months pregnant, which undoubtedly increased juror sympathy for her. Unknown to the jury, however, is that Pisani has operated food and

---

[1] The transcript of the State Case is submitted as Exhibits 1-5. Exhibits referenced by a letter, e.g., "Exhibit A," refer to the exhibits submitted by the government.

299 BROADWAY, SUITE 1405, NEW YORK, NEW YORK 10007   OFFICE 212.227.6655     SRGINSBERG@MAC.COM

Hon. Dora L. Irizarry
Page 2 of 12

hospitality businesses in Queens and the surrounding areas for approximately 19 years and has
never had a single complaint of this nature brought against him.  Moreover, as the Court is aware
from the numerous letters submitted on his behalf, a substantial number of prior and current
female employees have attested to his character and count him as one of their biggest champions.

In addition, the jury was also unaware that, at the time of the alleged incident, i.e., April
28, 2017, this Court had released Pisani on a $500,000.00 bond secured by two homes.  Thus, it
is difficult to fathom that after a 19-year spotless record, Pisani would choose to cross the line at
this particular juncture with all that was at stake.

Furthermore, though the jury obviously credited her testimony, there are a number of
facts that cut against the plausibility of the CW's story and are otherwise relevant to assessing
the State Case overall:

1. The CW testified on direct examination that, prior to working for Pisani, she had a
   job at which she was earning considerable money and that she left that job because
   she was missing too many important moments in her then one-year-old son's life.  In
   fact, this point was a centerpiece of the prosecutor's opening statement.  Exhibit 2 at
   45-46; Exhibit 3 at 6-7.

   After admitting on cross-examination, however, that she had earned $50,000.00-
   $60,000.00 per year at that job, had medical insurance, paid vacation, and a 401K
   plan, she conceded that she had in fact been fired from that job and after seven or
   eight months of unemployment, she went to work for Pisani earing $13 per hour.
   Thus, it was not her maternal instinct that led her to work for Pisani but rather
   financial need.  Exhibit 3 at 45-48.

2. Also consistent with the prosecutor's opening, the CW testified that she initially
   worked for Pisani at the Channel Market, which Pisani and his brother owned, but
   that Pisani was an "[a]gressive, tyrant-like" boss who made inappropriate comments
   that escalated over time and that she eventually quit.  Exhibit 2 at 45; Exhibit 3 at 7-8,
   10-13.[2]  The CW claimed that, thereafter, Pisani persuaded her to work for him at All
   American Bagel and Barista, which he and his brother also owned, i.e., the deli at
   which the alleged incident occurred.  Exhibit 2 at 45; Exhibit 3 at 13.

   On cross-examination, however, it became clear that in February 2017, when Pisani
   sold the Channel Market, he selected certain employees to work at All American
   Bagel and Barista, but the CW was not among them.  Pisani did, however, arrange for
   the CW to maintain her employment with the new owner of the Channel Market.
   Soon after Pisani sold the Channel Market, however, the CW quit and again turned to
   Pisani for employment.  Thus, despite her claim that Pisani was a "tyrant-like" boss
   who created a hostile work environment, she quit her job after Pisani had sold the

---

[2] In the prosecutor's opening, the CW's decision to quit was more closely linked to the claim that
Pisani made inappropriate comments.  In her testimony, however, she backed away from that
claim.

Hon. Dora L. Irizarry
Page 3 of 12

Channel Market and voluntarily followed him to All American Bagel and Barista. Exhibit 3 at 51-56.

3.   The jury was also told that April 28, 2017 was the first time that Pisani had been alone with the CW and that he took advantage of his long-held desire to make a sexual advance on her.  Exhibit 2 at 43.  This, too, was demonstrated to be false on cross-examination, as the CW conceded that she had been alone with Pisani on prior occasions, including just one week before the alleged incident.  Exhibit 3 at 58.

4.   The CW also claimed that there was video surveillance in the deli office where the alleged incident occurred.  This claim is belied, however, by several facts:

     a.   There is no indication in any of the reports by the New York City Police Department detective who handled the case that the CW ever informed him that there was video surveillance in the deli office.

     b.   A technician from the company that installed and services the video equipment throughout the deli testified that the camera in the office is a remnant from a prior system that is incompatible with the current system and that the camera was plainly unconnected to a recording system.  Exhibit 3 at 120-21.

     c.   There are also video monitors on the desk in the deli office—plainly visible to anyone who enters the office—that show all of the video feeds throughout the deli and none of the screens shows video from inside the deli office.  Exhibit 3 at 86.

5.   With respect to the video surveillance that does exist from the time of the alleged incident, what is plainly seen on the footage is that the CW left the office calmly and then casually descended the stairs from the office to the main floor of the deli while holding a cup of coffee in one hand and reading from the phone that she held in the other hand.  She then proceeded to the front of the deli, where she casually fixed herself a fresh drink, chatted with co-workers, and smilingly assisted a customer. Finally, she folded up her uniform and calmly exited the deli.

As the Court is aware, on May 10, 2017, Pisani submitted this video footage to this Court in opposition to the government's application to have his bail revoked based upon his arrest in the State Case.  The CW, therefore, had more than a year to review the video evidence and craft an explanation for her entirely calm demeanor in the video.  At trial, her claim was that her behavior on the video was an "act" that she employed because she was afraid of Pisani and did not want him to know that she was angry with him.  Her claim, however, is contradicted by her testimony that, as she left the office, she smiled and said to Pisani, "F--- you, count it yourself," referring to the money in cash register drawer that she had been counting in the office.  Her claim regarding her statement to Pisani—which is visible but not audible on the video—is incompatible with her claim that she did not want Pisani to know that she was angry

because she was afraid of him.  In other words, if she made that statement to him, (a) he knew that she was angry, and (b) she was not afraid to display her anger.

6. It is also obvious from the video and testimony at trial that the deli office is a busy location with a door that is unlocked and from which people come and go regularly. Thus, it is not a location in which most people would be likely to commit the alleged offense in the middle of the afternoon—particularly someone released on a $500,000.00 bond.

7. The CW also lied at the outset of the State Case when she met with the detective and told him that, following Pisani's alleged conduct, she "screamed and left." Exhibit 2 at 55.  At trial, however, she contradicted the detective and denied having reported that she "screamed and left."  Exhibit 3 at 76.  Rather, she claimed that she told the detective that she smiled and said "F--- you, count it yourself." *Id.*  In his testimony, however, the detective was clear that he wrote down what the CW had told him. Thus, it seems plain that, having seen the video, the CW realized that she could not maintain the lie that she told the detective, given that she plainly did not "scream and leave."  Accordingly, she molded her testimony to fit the video.

8. The CW also destroyed evidence.  During the period of time in the deli office during which she claims the incident occurred, she told Pisani about an experience she had had in traffic court the prior day and, in response, Pisani sent her a text message with the name and number of a lawyer who handles traffic matters.  Prior to producing her text messages with Pisani to the government and the state prosecutors, however, the CW deleted the message from Pisani with the name and number of the lawyer. Critically, she had messages from Pisani prior to the incident and subsequent to the incident but chose to delete just that one message.  Exhibit 3 at 68-74.

9. The circumstances surrounding the prosecution of the State Case are also somewhat unusual for a misdemeanor charge tried in criminal court:

   a. Despite the fact that it appears that the detective knew that Pisani was scheduled to appear in federal court on May 4, 2017, the detective appeared at Pisani's house to arrest him prior to that appearance.  Pisani, however, had already departed his home and was *en route* to court when the detective rang his doorbell.  Thereafter, the detective declined counsel's offer to surrender Pisani and instead arrested him outside the federal courthouse in the presence of the media, which generated the salacious media coverage to which the government referred in its letter to the Court.  Of import, had the detective succeeded in arresting Pisani at his home, Pisani would have failed to appear before this Court, which would have caused the entire matter to be discussed in detail on the record, which would similarly have generated media coverage. It, therefore, appears that there was an interest in generating media coverage of the matter from the outset.

Hon. Dora L. Irizarry
Page 5 of 12

b.  Thereafter, purportedly as a result of the inflammatory media coverage that
the matter received, the state prosecutors insisted that Pisani plead guilty to
the top charge or take the case to trial, which is highly irregular in any case
and particularly in a misdemeanor case of this nature.

c.  Then, with trial set to commence on June 20, 2018 and Pisani set to be
sentenced by this Court on June 21, 2018 (the State Court judge had agreed to
recess for the time required for sentencing), on June 18, 2018, despite the fact
that these allegations first surfaced more than a year earlier, the government
informed the Court and Pisani that it had obtained new evidence relevant to
allegations of obstruction of justice and requested that the Court adjourn
Pisani's sentencing.

d.  Two days later, when Pisani appeared in state court on June 20, 2018 to begin
trial, the state prosecutors informed him that the government had provided
them with evidence of obstruction of justice and that if Pisani did not take a
plea to the top charge in the State Case, he and his wife would likely be
indicted for witness tampering.  Confident of his innocence in the State Case
and with respect to the obstruction allegations, Pisani declined the offer.

e.  Then, on June 26, 2018, just hours after the jury began deliberations, articles
appeared in the media reporting that Patricia Adams—the person at the center
of the obstruction allegations—had pleaded guilty to witness tampering.
Critically, the articles contained far more information about Pisani than about
Adams.  When the parties appeared in court on June 27, 2018 for the jurors to
continue deliberations, the Judge in the State Case decided against inquiring
as to whether any of the jurors had seen the articles, but the timing could not
have been worse for Pisani.  Exhibit 5 at 2-6.

Taken as a whole, it is respectfully submitted that the above circumstances are such that
the Court should have pause before concluding that the § 3553(a) factors favor a harsh sentence
for Pisani due to his conviction in the State Case.  Defending a case of that nature in the "Me
Too" era is a steep uphill climb in the run-of-the-mill case but, with inflammatory media
coverage at critical junctures and without being afforded the normal opportunities to resolve a
case of this sort pretrial, Pisani's case was anything but typical.  It is also noted that Pisani
intends to appeal his conviction in the State Case.  Accordingly, it is respectfully submitted
that—apart from the increase in his Criminal History Category—the sentence in this matter
should not be increased based upon Pisani's conviction in the State Case.  The judge who
presided over the State Case will sentence Pisani on August 14, 2018 for the conduct at issue in
that case.

Hon. Dora L. Irizarry
Page 6 of 12

**<u>Pisani Did Not Attempt to Obstruct Justice</u>**

**A.  Introduction**

Contrary to the government's claims, Pisani respectfully submits that he did not engage in any efforts to tamper with a witness or to obstruct justice in connection with the State Case or this case (the "Federal Case").  In addition, to the extent that Patricia Adams engaged in any such conduct, she did so of her own accord.  Moreover, the available evidence indicates that Adams's efforts were aimed at influencing the State Case and not the Federal Case.  Accordingly, as discussed more fully below, Pisani respectfully submits that his Guidelines should not be increased based upon allegations of obstruction of justice.

The government claims that Patricia Adams, a reporter for, and the publisher of, a local newspaper known as the Forum, met with the father of the CW in an effort to convince him to dissuade the CW from pursuing allegations of forcible touching against Pisani.  The government argues that Adams's efforts constitute obstruction of justice under two theories and that, because she acted under Pisani's direction, an offense level increase for obstruction of justice under the Guidelines is applicable to Pisani.   Even assuming *arguendo* that the government could demonstrate that Pisani directed Adams, the government's theories regarding Adams's conduct do not support an offense level increase under the Guidelines.   Moreover, given that the evidence does not support the government's claim that Pisani directed Adams's conduct, an offense level increase is not justified under any theory.

With respect to Adams, the government claims that she sought to prevent the CW from testifying in the bail revocation hearing in the Federal Case and that, under the relevant case law, interfering with a bail revocation proceeding is sufficient to warrant an offense level increase under the Guidelines.  As discussed below, however, the evidence does not support the government's factual assertions in this regard.  Adams's conduct was plainly designed to influence the State Case and not the Federal Case, which does not warrant an offense level increase under the Guidelines.

The government implicitly acknowledges the factual weakness of its first argument regarding Adams's conduct and thus it also advances the attenuated theory that, given that Adams sought to prevent the CW from pursuing her claims against Pisani in the State Case and that because a conviction in the State Case would have the effect of increasing Pisani's sentencing exposure in the Federal Case, Adams's efforts to interfere with the State Case qualify as obstruction of justice with respect to the Federal Case.  The government does not offer any legal support for this theory and, it is respectfully submitted, this Court should not adopt it.

**B.  The Government Misrepresents the Nature of the Relationship between Pisani and Adams**.

The evidence is clear that Pisani and Adams have a longstanding relationship based on their mutual business interests in the Howard Beach section of Queens.  In an effort to cast their relationship in nefarious terms, however, the government depicts the matter in a manner that is inconsistent with the evidence.

Hon. Dora L. Irizarry
Page 7 of 12

Thus, for example, the government attempts to link Pisani to Adams's conduct by alleging that Adams patronized a sports betting business that the government alleges is "controlled by the Bonnano crime family." Gov. Ltr. at 3. As an initial matter, the government offers no support for its allegation that Adams's gambling is in fact connected to the so-called "Bonnano crime family." More to the point, however, the government does not allege that Pisani had any connection to Adams's gambling or to the sports betting business. In addition, the government neglects to mention that the text messages related to Adams's gambling—which were not between Adam's and Pisani but were with an unidentified third party—occurred in 2014; their relevance to the events at issue here, which occurred in May 2017 is, therefore, difficult to discern. Exhibit B.

Notwithstanding the government's spin, the evidence is plain that Pisani and Adams had a business association derived from his operation of All American Bagel and Barista in the Howard Beach neighborhood of Queens and her operation of the Forum, a local newspaper that serves that community. Exhibit C. Indeed, the article in the Forum makes clear that Pisani has a stellar reputation in that community as a valued business owner, which is amply supported by the numerous letters submitted to the Court on his behalf. Notably, the article points out that Pisani was able to rebuild and reopen his store after it was destroyed by Superstorm Sandy as the result of his honor and integrity, which prompted an unsolicited offer to finance the rebuilding. Exhibit C at 2-3.

Their business association is further supported by text messages between Adams and Pisani in which the two discuss Pisani's efforts to assist Adams in negotiating a deal to open a local restaurant. Exhibit D. Though the government seeks to cast a negative pall over these communications, too, it is plain that Adams sought Pisani's assistance based upon his knowledge of the industry, experience running similar businesses in the neighborhood, and his familiarity with the parties on both sides of the negotiation. Gov. Ltr. at 4; Exhibit D at 2-11. Indeed, Adams's reference to Pisani as "the boss," which she kiddingly informed Pisani is a reference to him "Lol," is clearly a nod to his professional acumen and the respect that she had for him in that regard. Exhibit D at 10. Notably, in the end, despite Pisani's assistance, it appears that Adams was unable to close a deal to open a restaurant. Exhibit D at 10-11.

Given their relationship, not surprisingly, when Pisani was indicted in the Federal Case, Adams was sympathetic to Pisani and his family, who were traumatized by the experience and deeply disturbed by the onslaught of negative publicity that ensued. Thus, Adams's purported willingness to use her contacts at other local newspapers in an effort to avoid further negative publicity that might impact Pisani's livelihood while he defended against the charges against him (*see* Gov. Ltr. at 4) is not surprising and certainly not illegal, particularly given that a defendant is supposed to be presumed innocent unless proven otherwise. Moreover, any efforts that she may have made—and there is no evidence that she actually made any—were unsuccessful.

The evidence is, therefore, clear that—notwithstanding the government's claims to the contrary—Pisani and Adams had a relationship based on their respective business interests in their shared community.

Hon. Dora L. Irizarry
Page 8 of 12

**C. The Text Messages from Adams to Pisani and to Pisani's Wife Demonstrate that Adams Inserted Herself into the Situation and that Pisani Did Not Direct Her or Have Knowledge of Her Intended Conduct**.

The text messages between Adams and Pisani and his wife demonstrate that it was Adams who sought to insert herself into the situation and that Pisani did not enlist her aid, apart from his request that she assist him in obtaining a character letter. Moreover, the text messages provide no evidence that Pisani directed Adams or that he was even aware of what she in fact intended to do.

The government, however, attempts to paint a different picture. Thus, for example, in an attempt to prove that Pisani contacted Adams to enlist her to engage in obstruction of justice, the government states that "[b]etween March 31, 2017 and May 12, 2017, the defendant and Adams did not exchange any text messages." Gov. Ltr. at 6. While that is accurate, there was certainly contact between Pisani's wife, Jamie, and Adams during that period. In addition, the messages between Pisani and Adams indicate that they also saw each other in person and spoke by telephone. In addition, it is clear from the transcript of the text messages that many messages are missing, as evidenced by messages that appear to be in response to others that are not in the text message transcripts that the government provided. *See* Exhibits D and E.

In addition, though the government recounts several of the exchanges between Adams and Jamie during the period from March 31 – May 12, 2017, the government fails to acknowledge that it was Adams who regularly sought to insert herself into the equation and not Pisani or Jamie who engaged Adams in most instances. Thus, by way of example, on May 5, 2017, the morning after Pisani's arrest in the State Case when both the New York Daily News and the New York Post published inflammatory articles about Pisani, Adams contacted Jamie to inquire about her welfare. Exhibit E at 2. Then, again, on May 8, 2017, it was Adams who contacted Jamie to ask whether she could be of assistance. Exhibit E at 3. Adams elaborated, indicating that she would "love" to write an article and an editorial to help Pisani. *Id*. Tellingly, Jamie informed Adams that Pisani "said better not to say anything until it's settled." *Id*.

Importantly, when Pisani did contact Adams on May 12, 2017, he did so, not for an improper purpose, but to request her assistance in obtaining a character letter from State Senator Joseph Addabbo. Exhibit D at 11 (the government does not indicate from whom Pisani wanted a letter but rather states that he wanted a letter "from another individual" Gov. Ltr. at 6). Notably, the article in the Forum by Adams that was published when Pisani reopened his deli following its destruction by Superstorm Sandy is accompanied by a photograph of Pisani and his family along with Senator Addabbo cutting the ceremonial ribbon. Exhibit C. Adams's association with Senator Addabbo is also reflected in her text messages to Pisani in 2016. Exhibit D at 2, 5, 11. Adams, in keeping with her pattern, agreed to ask for the letter and also offered to write one herself, which she did. Exhibit 6, Letter from Patricia Adams, dated May 14, 2017.[3]

---

[3] The government incorrectly concludes that, because Adams's letter was not produced as an exhibit when the parties appeared for the scheduled bail hearing on May 16, 2017, the exchange between Pisani and Adams was a coded communication setting the stage for an effort to obstruct justice. Gov. Ltr. at 12 n. 9 and 14. What the government overlooks, however, is that just before

Hon. Dora L. Irizarry
Page 9 of 12

The government's argument that Pisani intentionally prompted Adams by referencing the CW's connection to a prior report that the CW made involving someone engaged in sexual conduct in a local park totally ignores the context of the exchange.  Gov. Ltr. at 6, 14.  Thus, contrary to the government's characterization, Pisani did not "prompt" Adams.  Gov. Ltr. at 14. Adams prompted Pisani with her inquiry as to the identity of the female who had accused him. Exhibit D at 12.  Pisani made no reference to the article in the Forum about the incident and did not indicate that he had any knowledge that Adams knew the CW or her father.  *Id*.  Moreover, it was Adams who again sought to insert herself into the situation.

Following Pisani's description of the CW, Adams apparently realized that she was acquainted with the CW's father and sent a text message to Pisani and then to Jamie indicating that *she wanted to speak with them because she believed that she could be of assistance*.  Exhibit D at 4; Exhibit E at 3.  Moreover, though Adams indicated in her text message to Jamie that she did not want to communicate her thoughts on the subject via text message, if what she was proposing were illegal, it does not make sense that she would signal her intentions, as the government apparently believes that she did.  Gov. Ltr. at 15.  Indeed, certain matters are too complicated to discuss via text message and are better addressed in a telephone conversation or in person.

Thus, taken as a whole, the text messages demonstrate that it was Adams who inserted herself into the situation.  Moreover, the text messages lack any indication that Pisani directed Adams or was aware of the conduct in which she intended to engage.

**D.  The Government Adopts Adams's Obviously False Statements During Her Meeting with the CW's Father and Ignores those that Benefit Pisani**.

It is respectfully submitted that the government's reliance on certain obviously false statements by Adams to the CW's father and its concomitant failure to address others that benefit Pisani diminishes the force of its argument as a whole.  During her meeting with the CW's father, Adams makes a number of statements that are obviously false but which the government would have the Court conclude are accurate and others that are helpful to Pisani that the government ignores altogether.  Indeed, early on in the conversation, Adams claims that she received a call from someone whom she imitated with a deep voice warning that "[Adams] better f_____ing fix this!" and informing her that she had "a week" to do so.  Gov. Ltr. Exhibit K at 22. As the text messages between Adams and Pisani and his wife make clear, however, that is not at all what occurred, i.e., the text messages indicate that Pisani sought assistance in obtaining a character letter and Adams inserted herself into the situation.  Yet, the government argues that the fictitious "you better fix this" call "is a reference to speaking with the defendant about the plan to contact with (*sic*) the [CW]'s father."  Gov. Ltr. at 16.

---

the scheduled hearing, the government informed Pisani of the obstruction of justice allegations. In light of that disclosure, it was determined that a character reference from Adams would not be beneficial.

Hon. Dora L. Irizarry
Page 10 of 12

In making this argument, the government ignores that it was Adams who repeatedly inserted herself into the situation and that it was Adams who informed Pisani and Jamie that she believed that she could be of assistance.  Exhibit D at 12; Exhibit E at 3.  Adams plainly never received any such call demanding that she "fix this!"  Indeed, the government's position regarding this issue is inconsistent with its theory with respect to the text messages between Adams and Pisani.  Thus, on the one hand, the government maintains that Adams statement about a call that she received in which someone demanded that she "fix this" is a reference to Pisani, yet, on the other hand, the government argues that Pisani went through the trouble of sending Adams coded text messages to "prompt" her regarding the identity of the CW.  Moreover, the government ignores that, in her communications with Jamie, Adams referred to her intended conduct as "her plan" and not "our plan."  Exhibit E at 4; *see also* Exhibit K at 46 (Adams: "I agreed with myself to have a conversation with you.").

Correspondingly, given her obvious lie about being directed to "fix this," the government's reliance on Adams's statement that she was "worried about this one, and who I have to answer to" is of no probative value in determining whether Pisani instructed her to meet with the father.  Gov. Ltr. at 7-8.  Adams's claims about a "personal liability" and being "kind of under their . . . thumb," Gov. Ltr. at 8, are also without any evidentiary value, given that the evidence in no way indicates that she was summoned by Pisani to "fix" anything but rather repeatedly inserted herself into the situation.

In addition, despite latching on to statements from Adams that are demonstrably false, the government fails to draw to the Court's attention statements that Adams made that are beneficial to Pisani.  Significantly, in the context of discussing the negative ramifications that the case could bring for the CW, her father stated to Adams that Pisani "knows a lot of people" to which Adams replied that Pisani would never seek to cause her any harm whatsoever:

> I would tell you right now, I will tell you right now, there is absolutely, I will guarantee you right now, there is absolutely no chance in hell, she goes through, she does whatever she wants to do, she will never suffer a ramification from him. That I can guarantee you.

Recording at 1:20:27; *see also* Exhibit K at  54.

Subsequently, Adams reiterates that Pisani has no interest or intention of causing the CW any harm:

> Like I told you, I can guarantee you that no action would ever be taken against her by him.  Not like "I'm gonna get this little bitch" or anything.  Nothing will ever come from that direction.

Recording at 1:48:36; *see also* Exhibit K at 72-73.

It is respectfully submitted that the government's selective reliance on certain of Adams's statements that are obviously false and its failure to acknowledge others that are beneficial to Pisani weakens the totality of its position regarding the evidence of obstruction.

Hon. Dora L. Irizarry
Page 11 of 12

**E.  The Government Ignores the Evidence that Adams's Conduct Was Directed toward the State Case**.

The government also argues that Adams intended to interfere with the CW's planned testimony at the bail revocation hearing scheduled in the Federal Case but fails to address Adams's clear references to the State Case. *See, e.g.*, Gov. Ltr. at 8-10, 13-14. Adams, however, refers to the CW signing papers, which, upon information and belief, likely refers to the supporting affidavit in the State Case, given that the CW was not slated to sign any papers in the Federal Case. *See, e.g.*, Exhibit K at 13, 44, 53, 61, 71; *see also* Exhibit E at 3. By contrast, though she references federal prosecutors and law enforcement agents and the fact that Pisani is on bail, she never references the CW's participation in the bail revocation hearing. Her comments, therefore, appear to relate to the CW's participation in the State Case. *See, e.g.*, Exhibit K at 13, 44, 53, 61, 71.

**F.  There Is a Lack of Evidence that Pisani Directed Adams or Knew that She Intended to Threaten the CW**.

As the above discussion of the facts makes plain, the events leading to Adams's meeting with the CW's father do not support the conclusion that Pisani directed Adams or that he was even aware that Adams intended to threaten the CW. Moreover, Pisani's conduct following the meeting further evidences the weakness of the government's claim regarding Pisani's involvement.

The government offers evidence of communications between Pisani and Adams following her meeting with the CW's father that the government claims demonstrate that Pisani directed Adams's conduct. Gov. Ltr. at 11-12, 15. Pisani, however, expressed little interest in whatever it was that Adams wanted to communicate to him.

Adams contacted Pisani on May 14, 2017 via text message and stated that she had had "the business meeting" about which she had told Pisani. Exhibit D at 12. After initially indicating that he would see Adams the following day, Pisani subsequently told Adams that she could convey any information to his brother at the deli. Exhibit D at 12. Thus, even if one credits the government's theory that the text messages between Adams and Pisani and between Adams and Jamie indicate that Pisani was likely aware that Adams intended to meet with the CW's father, Pisani's lack of interest in learning about the outcome of the meeting is incongruous with the government's claim that he had demanded that Adams "had better fix this" and that she had "a week" to do it.

Furthermore, assuming *arguendo* that Adams communicated to Pisani that she knew the CW's father and that she would talk to him and inform him that she believed that the CW was lying and advise him that it would redound to his daughter's detriment if she went forward with false claims, there is no evidence that Pisani had foreknowledge that Adams intended to threaten the CW or otherwise illegally attempt to influence her. Moreover, apart from the fact that there is no evidence that Pisani had advance knowledge that Adams would indicate that, even if she were telling the truth, the CW would suffer harm, it appears from the context of the conversation that Adams viewed her comments as a simple acknowledgement that being at the center of a case

Hon. Dora L. Irizarry
Page 12 of 12

of that sort would be an unpleasant experience with negative consequences for anyone involved regardless of the truth. *See, e.g.*, Exhibit K at 42, 46. Plainly such comments were ill-conceived, but Adams's poor judgment should not be Pisani's burden to bear. The evidence makes plain that Adams sought from the outset to insert herself and that she repeatedly misrepresented to the father how she came to be at the meeting. Moreover, to the extent that Adams is to be believed, she stated unequivocally that the CW would never suffer any negative consequences from Pisani.

**G. Adams's Guilty Plea Does Not Support the Conclusion that Pisani Obstructed Justice**.

The government also attempts to buttress its argument with Adams's guilty plea to misprision of a felony based upon her claimed concealment of her purported knowledge that another individual attempted to tamper with a witness. Gov. Ltr. at 16. Adams's plea, however, is of no probative value in the instant matter. The evidence that the government has submitted to the Court here, as discussed above, makes clear that Adams did not conceal another individual's attempt to tamper with a witness; it was Adams who attempted to tamper with a witness. The plea is, therefore, contrary to the facts. Moreover, it appears from Adams's plea allocution that it was tailored for exactly the use to which it is now being put, i.e., to implicate Pisani.

\* \* \*

In sum, based upon the above, the government has failed to establish that Pisani directed Adams, or was aware that Adams intended, to tamper with a witness. Plainly that was her intention, but it cannot be said from the evidence that Pisani had any such intention or that he was aware that Adams intended to act as she did during her meeting with the CW's father. Pisani could well have believed that Adams, who had a prior relationship with the father, in accordance with the law, intended to discuss the State Case with the father in the hopes that upon hearing Adams's view of the evidence, the father would not want his daughter to proceed with a false claim. Moreover, Pisani's subsequent lack of interest in hearing directly from Adams what had occurred at the meeting plainly indicates that he did not put much stock in whatever it was that he may have believed Adams intended to do. Accordingly, it is respectfully submitted that an offense level increase for obstruction of justice is not warranted.

## Conclusion

For the reasons set forth above, Pisani maintains that he has an offense level of 14 in CHC II with a corresponding advisory range of imprisonment of 18-24 months. Based upon the above, together with the information contained in Pisani's initial sentencing submission, it is respectfully submitted that the factors under 18 U.S.C. § 3553(a) do not warrant the harsh treatment for which the government advocates.

Respectfully,


s/Seth Ginsberg

cc:      Government Counsel (via ECF)